UNION INS. CO. (HOWE v.). See 42 Cal. 529.

UNION INS. CO. (HUMPHREYS v.). See Case No. 6,871.

UNION INS. CO. (HURTIN v.). See Case No. 6,942.

UNION INS. CO. (MARSHALL v.). See Cases Nos. 9,133–9,135.

UNION INS. CO. (QUEEN v.). See Case No. 11,505.

UNION INS. CO. (RUSSEL v.). See Cases Nos. 12,146 and 12,147.

---

## Case No. 14,366.

### UNION INS. CO. v. SHAW et al.

### EXCELSIOR INS. CO. v. SAME.

[2 Dill. 14.] [1]

Circuit Court, E. D. Missouri. 1871.

SHIPPING—PUBLIC REGULATIONS—NUMBER OF PASSENGERS—CARRYING COMBUSTIBLE MATERIALS.

1. Whether sections 9 and 10 of the act of August 30, 1852 (10 Stat. 61), as to the number of passengers vessels may carry, apply to steamers navigating inland waters, quære? (It was held in this court in 1855, that this portion of the act did not apply to Mississippi steamers.)

2. The act of July 25, 1866 (14 Stat. 227), prohibiting ignitible commodities from being "carried on the decks and guards" of passenger steamers, "unless protected by a complete and suitable covering of canvass or other proper material, to prevent ignition from sparks," construed; and it was held that hay in bales piled up in the engine or deck room, back of the engines, and surrounded and protected by a tier of grain in sacks (made of burlaps or jute-cloth) on each side, and two or more tiers on each end, and extending from the floor to the carlings or ceiling, and stripped with plank to make the sacks steady, was a sufficient compliance with this statute.

3. Hay thus placed in the engine or deck room, though the room be enclosed by bulkheads, is upon "the decks or guards" of the steamer within the meaning of the above mentioned act. Per Treat, J.

4. In an action against the owner of a steamboat to recover the value of cargo destroyed by fire, on the ground that the loss was occasioned by the carelessness of the officers of the boat, the burden of proof is on the plaintiff to establish the alleged negligence of the officers, and that it caused or contributed to produce the injury.

These causes are here by appeal from the decrees of the district court for the Eastern district of Missouri.

The respondents were the owners of the steamer Stonewall, which, in proceeding on a voyage from St. Louis to New Orleans, was destroyed by fire on the 27th day of October, 1869. The libellants had insured against fire goods on board of the boat embraced in bills of lading which excepted unavoidable dangers of the river and fire. The goods were destroyed by the fire, and the libellants being liable under their policies paid the shippers

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

the value of the goods thus consumed; and claim that thereby they became subrogated to the rights of the persons thus insured. And these are libels in personam by the insurance companies against the owners of the Stonewall to recover the amount thus paid by them to the shippers or owners of the cargo insured; and the ground of recovery as stated in the libels is, that the "loss was occasioned by carelessness and gross negligence of those having charge of the boat." The respondents deny the alleged negligence, and the cause was submitted to the district court upon the testimony produced by the respective parties, and decrees were entered January 15, 1872, dismissing the libels from which the present appeals are prosecuted.

The following opinion was delivered by the district judge:

"TREAT, District Judge. These are libels in personam against one of the owners of the steamer Stonewall to recover on a contract of affreightment. The cargo was destroyed by fire (one of the excepted perils) during the voyage. It is alleged in the libel that the loss resulted from the carelessness and negligence of the officers and crew.

"Under the recent decisions of the United States supreme court the burden is on the libellant to prove the alleged negligence, inasmuch as the destruction by fire is undisputed. Libellant contends that inasmuch as the steamer had on board at the time of the loss more than the number of deck passengers named in the inspector's certificate, therefore there was a direct violation of a penal statute, and when to that fact proof is adduced that the fire, when discovered, could probably have been extinguished if the passengers had not in their terror rushed over the officers and crew, preventing thereby the prompt use of the hose attached to the engine, the fact not only of negligence should be considered as fully established, but of negligence contributing to the loss. Whether section 10 of the act of 1852 is applicable to river steamers, would, if the question had not been judicially determined, admit of serious doubt. That section provides that 'in those cases where the number of passengers is limited by the inspector's certificate,' &c., certain penalties shall be incurred if an excess of passengers is taken on board. What are those cases—not as a matter of fact, but of law? Is it when an inspector places in his certificate the number of passengers allowed, or when he does so in accordance with the requirements of law? Section 10 evidently refers to section 9; and it was decided by the United States circuit court here as early as 1855, that the 10th section did not apply to steamers on these inland rivers. So long as that ruling remains undisturbed this court ought to follow it. Subsequent legislation seems to confirm that ruling. The fact that there were more than one hundred deck passengers on board—even if such be the admitted fact, does not of itself show an act of negligence, and

the rush of passengers to escape an impending calamity cannot be set down as an act of negligence on the part of the officers and crew contributing to the loss complained of. It seems that the steamer had, in what is termed the engine or deck room, over two hundred bales of hay, piled in two tiers in the centre of that room, two bales deep, transversely along either side of the stanchions in the centre, extending from a point some twenty feet from the doctor forward, past the main hatchway aft. The testimony is not entirely in accord as to the manner in which sacks of oats were piled around the hay. The preponderance is, that about two thousand sacks of oats were so placed 'a-burden' as to make at least two rows in front, more at the aft end, and one on either side; that the oat sacks were piled from the deck up to the carlings or ceiling of the boiler deck above; that when the boat started such was the position of the hay, thus protected by sacks of oats, that no access could be had to the hay without first displacing or removing oat sacks. Some witnesses insist that, while the hay was piled up to or nearly to the carlings, the oats were jammed quite close, and even between the carlings, so that no appreciable or observable opening could be detected. Others say that the oats had settled aft so that a man could crawl over the top, and thus pass to the hay. One fact is clear, that when the fire was first detected, one or more persons did pass over the sacks of oats to the hay through an opening on the top of the sacks, caused by the removal or absence of sacks close to the carlings at that point. The fire was first discovered on the hay at a point not far from the main hatchway and near the hog-chain, around which the hay and oats were piled. The first efforts made to extinguish it were by striking at it with the hats of some deck passengers and then attempting to smother it with bed clothing; at the same time an effort was made to pass the hose aft, but the terrified passengers rushed forward with such violence as to run over those in charge of the hose as they were dragging it along the gangway between the oats and a wing-tier of cargo on the larboard side. From the testimony, direct and indirect, the flames spread with great rapidity and violence. The rush of deck passengers to the bow would indicate that that was, apparently, at the moment, the safest part of the steamer. But almost simultaneously with the first alarm of fire, the pilot rounded the vessel to, so that she soon landed on a bar. It being evident then that the boat could not be saved, passengers, officers, and crew looked exclusively to their means of escape with life. Out of the large number on board only a few were saved, the residue perishing either in the flames or in the river. Hence it is obvious that the conflagration was very rapid. In the light of the testimony it does not satisfactorily appear how the fire occurred. One witness swears it was caused by carelessness of a passenger in over-

turning a lighted candle upon the oat sacks; but that account is hardly consistent even with her own testimony as to the instantaneous spread of the flames, or with the testimony of other witnesses.

"Another hypothesis is, that the fire commenced in the hold forward, and after burning there for some time undetected, as the hatchways were closed, found vent at a pump hole near the hog-chain, or at the aft hatches —that probably the suddenness and fierceness of the flames were caused by the bursting of one or more barrels of whisky in the hold with which the fire below had come in contact. This theory is based mainly on the appearance of the hull, decks, and cargo on subsequent examination. Another hypothesis is, that some of the deck passengers had crawled over the oats and reached the hay for the purpose of sleeping there during the night. The fire occurred soon after supper; and it is said that those persons on the hay may have set fire to it by the careless use of their pipes, or in some other way. This is also conjectured. There is no evidence showing satisfactorily that any one of the three hypotheses is correct. The case stands as a loss by fire, the origin of which is unknown. The act of July 25, 1866, requires 'that cotton, hemp, hay, straw, or other easily ignitible commodity, shall not be carried on the decks or guards of any steamer carrying passengers * * * unless the same shall be protected by a complete and suitable covering of canvass or other proper material to prevent ignition from sparks, under a penalty,' &c. The act of 1852, § 7, provided that 'no loose hemp shall be carried on board of any such vessel; nor shall baled hemp be carried on the deck or guards thereof, unless the bales are compactly pressed and well covered with bagging or a similar fabric,' &c. The act of 1866, it will be seen, was designed to provide further safeguards against danger from fire, both in the transportation of hemp, and also in the transportation of hay, cotton, straw, &c. Hemp, under the act of 1852, on the deck or guards, was not only to be baled but well covered with bagging; and under the act of 1866, 'protected by a complete and suitable covering of canvas or other proper material to prevent ignition from sparks.' The same precaution is required for hay under the last named act, the phraseology as to covering it being changed in the two acts. It is not important to criticize the change in phraseology as to hemp, but merely looking at the language as applicable to hay, to determine whether the mode adopted in this case meets the requirements of the law.

"That hay in the engine room or deck room is within the purview of the act of congress seems sufficiently clear. Whether stowed there, or on the forecastle deck, or on the guards, it must be protected by complete and suitable covering.

"What would be suitable in one position might be unsuitable in another. The degree of precaution should correspond with the danger. If these were suits for enforcement of the statutory penalty, such would be the ruling. Now if the hay in the engine room were as completely protected by the sacks of oats as some witnesses testify, the requirements of the statute were met in the light of the testimony of the local inspectors and others. But even if there were a defective covering or protection, yet if such non-compliance with the statute was not at all contributory to the loss, the owners would not be liable.

"The burden is on the libellants to prove contributory negligence, and the evidence leaves it in doubt, first, whether the hay was not fully protected as required, and, secondly, whether any supposed act of negligence on the part of the officers or crew contributed in any degree to the loss by fire. It is not meant that if the hay were properly protected at the commencement of the voyage, the owners would be excused, if it was suffered to become uncovered at any time thereafter during the voyage. Their duties continue in that respect throughout the voyage, and it is for them to exercise all needed care and diligence to that end, as well against the disturbance of the covering by deck passengers as against the blowing of a canvass covering from the hay. It is the duty of a common carries never to relax his watchfulness or care for the safety of the cargo and passengers. In proportion to the recklessness and ignorance of the deck passengers should be the care and diligence of officers and crew.

"If the evidence satisfied the court that the loss was caused by defective covering of the hay, by any act of negligence on the part of the officers or crew, or by defective apparatus—or that such defects or neglect contributed to the disaster—then the defendant would be held liable. But in the absence of such satisfactory proof, the libels must be dismissed."

Sharp & Broadhead and Hendershott & Chandler, for libellants (appellants).

Thomas T. Gantt and Rankin & Hayden, for respondents.

Before DILLON, Circuit Judge, and KREKEL, District Judge.

DILLON, Circuit Judge. Concurring as we do in the main with the views expressed in the opinion of the district judge dismissing the libels, it is not necessary to discuss the questions presented at any considerable length.

Upon the record it is not at all material to determine whether the ninth and tenth sections of the act of August 30, 1852 (10 Stat. 61), in respect to the number of passengers vessels are permitted to carry, apply to steamers navigating inland rivers. It was determined in this circuit, in 1855, that this portion of the act does not apply to steamboats plying on the Mississippi river. But if it

were conceded that it is otherwise, the result in these cases would be the same, for upon examining the evidence we are not satisfied that in fact the boat had more than one hundred deck passengers (that being the number limited in the inspector's certificate) at the time of the disaster. Nor does it appear, on the supposition that there may have been more than one hundred such passengers on board, that this circumstance caused the fire, or that it materially interfered with the efforts to extinguish it, or contributed to the loss of the boat and cargo.

The next question made arises upon the fifth section of the act of July 25, 1866, which provides "that cotton, hemp, hay, straw, or other ignitible commodity, shall not be carried on the decks or guards of any steamer carrying passengers, unless the same shall be protected by a complete and suitable covering of canvass or other proper material, to prevent ignition from sparks, under a penalty of," etc. 14 Stat. 227.

The hay was piled up in the engine or deck room, in the manner stated in the opinion of the district court, reaching from the floor to the carlings or ceiling, and surrounded by sacks of oats and grain, piled up in like manner, and stripped with plank to keep them steady. The hay was not covered with tarpaulins or canvass.

The point is made by the respondents, that the hay being thus placed in the engine or deck room, which was shown to have been enclosed by bulkheads, was not upon "the decks or guards" of the steamer within the meaning of the section of the act of congress above mentioned. The district court expressed on this subject a contrary opinion, and its view has much to recommend it as tending to the security of life and property, which was the object of the legislative provision. But without entering into an examination of this question, we place our judgment of affirmance upon the ground which we shall proceed briefly to state.

The evidence satisfies us that the hay, surrounded and protected as it was by a tier of grain in sacks (made of burlaps or jute-cloth), on each side, and two or more tiers of such sacks on each end, was thereby rendered more secure from fire than it would have been if simply covered with canvass. The act of congress does not prescribe all the modes in which the ignitible commodities shall be protected. The protection must be complete and suitable, whatever mode is adopted. This may be by canvass; but any other mode is sufficient if it affords an equivalent protection and is complete and suitable, that is, adapted to the risk of fire and the degree of exposure. The material out of which these sacks are made is shown not to be easily ignited; it will char, but not burn into a flame when surrounding grain. All the witnesses concur in stating that the hay surrounded and covered by sacks in the manner shown by the testimony was more secure from fire than if it had been completely covered with canvass or tarpaulins.

The evidence leaves the origin and cause of the fire in uncertainty. It either originated in some unknown manner in the hold and thence extended to the hay through the old pump hole, or it was caused by some deck passengers who had displaced, without the knowledge of the officers, some sacks, and had in this way obtained access to the top of the bales of hay. I confess that the circumstances of the burning rather impress me with the conviction that the fire originated in the hold; but it is shrouded in mystery and wholly unexplained.

The libellants base their right to a recovery wholly upon negligence of the officers of the boat, which, they claim, caused the fire, and consequently the loss of which they complain. The burden of proof is upon them to establish the proposition of fact that it was owing to the negligence of the officers of the boat that the fire was caused; and it is our judgment that the evidence falls very far short of doing this. See Transportation Co. v. Downer, 11 Wall. [78 U. S.] 129; Railroad Co. v. Reeves, 10 Wall. [77 U. S.] 176, 190. Affirmed.

NOTE. No appeal to the supreme court was prayed.

The proposition ruled in 1855, upon the act of 1852, mentioned in the opinion, was decided by Mr. Justice Catron and District Judge Wells.